2023 IL App (2d) 210718
No. 2-21-0718
Opinion filed March 14, 2023

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| AMERICAN ACADEMY OF PEDIATRICS, | ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 20-MR-920 |
| THE DEPARTMENT OF REVENUE, LAKE PARK HIGH SCHOOL DISTRICT NO. 108, ITASCA ELEMENTARY SCHOOL DISTRICT NO. 10, THE ITASCA FIRE PROTECTION DISTRICT, THE ITASCA PARK DISTRICT, and THE ITASCA COMMUNITY LIBRARY, | ) ) ) ) ) ) ) ) | |
| Defendants-Appellees. | ) ) ) | Honorable Craig R. Belford, Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Hutchinson and Hudson concurred in the judgment and opinion.

## OPINION

¶ 1    After plaintiff, the American Academy of Pediatrics, relocated its headquarters from Elk Grove Village to Itasca, it sought a charitable-use property tax exemption for the property, under section 15-65(a) of the Property Tax Code. 35 ILCS 200/15-65(a) (West 2020). Initially, defendant the Department of Revenue (Department) approved the property for an exemption. Subsequently, defendants taxing districts Lake Park High School District No. 108, Itasca Elementary School District No. 10, Itasca Fire Protection District, Itasca Park District, and Itasca Community Library

(collectively, taxing districts) objected and requested an administrative hearing, after which the administrative law judge (ALJ) recommended that the Department reverse its decision. The Department accepted the ALJ's recommendation and denied plaintiff's application for an exemption. Plaintiff sought administrative review, and the circuit court affirmed. Plaintiff appeals. We affirm.

¶ 2                                        I. BACKGROUND

¶ 3            A. Plaintiff's Organization, Structure, and the Use of the Subject Property

¶ 4      Plaintiff was incorporated in Illinois in 1930 and is an Illinois not-for-profit corporation. Its certificate of organization states that plaintiff was formed

> "to foster and stimulate interest in pediatrics and correlate all aspects of work for the welfare of children which properly comes within the scope of pediatrics; to promote and maintain the highest possible standards of care for pediatric education in medical schools and hospitals, pediatric practice and research; to perpetuate the history and best traditions of pediatrics and ethics; to maintain the dignity and efficiency of pediatric practice in its relationship to public welfare; to promote publications and encourage contributions to medical and scientific literature pertaining to pediatrics; none of which objects is for pecuniary profit."

¶ 5      Neither plaintiff's certificate of organization nor its bylaws state that plaintiff is a "charity." Its financial statements for 2016 and 2017[1] provide that plaintiff is a "professional organization

_____

[1]Financial information focused on the 2016-17 fiscal year because the taxing districts challenged the Department's determination that plaintiff was entitled to the charitable-use property tax exemption for 2017.

whose purpose is the attainment of optimal physical, mental and social health for all infants, children and young adults through education, advocacy, research and service." Plaintiff's Internal Revenue Service (IRS) Form 990 for the 2016-17 fiscal year (*i.e.*, July 1, 2016, to June 30, 2017) states that plaintiff is a professional membership organization of 66,000 primary care pediatricians and pediatric medical specialists. Its mission "is to attain optimal physical, mental, and social health and well[-]being for all infants, children, adolescents, and young adults. To accomplish this mission, [plaintiff] shall support the professional needs of its members."

¶ 6    Plaintiff's constitution provides that it is "an organization of physicians who care for infants, children, adolescents, and young adults" that is "dedicated to the principle of a meaningful and healthy life for every child." It promotes its goal "by encouraging and assisting its members in their efforts to meet the overall health needs of children and youth; by providing support and counsel to others concerned with the well-being of children, their growth and development; and by serving as an advocate for children and their families within the community at large."

¶ 7    Plaintiff is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3) (2012)) and has been exempt from federal income tax since the 1935 tax year. The Department and the State, in 1993 and in 1998, determined that plaintiff was exempt from sales tax, because plaintiff was "organized and operated exclusively for charitable purposes." Plaintiff has no capital structure or capital stock, and it does not disburse dividends or other profits.

¶ 8    Since at least 1955, plaintiff's headquarters, first in Evanston and then in Elk Grove Village, were exempted from property taxes under the charitable-use exemption. In 2017, plaintiff moved to a new headquarters in Itasca. Plaintiff's property, which it owns, is located at 345 Park Boulevard in Itasca (property identification No. 03-06-202- 011 prior to 2018 and No. 03-06-202- 013 beginning in 2018) and consists of 11.2 acres. Plaintiff acquired the property in February 2015,

and it was unimproved at the time of acquisition. Plaintiff built an office building (of about 183,000 square feet) on the property, and since December 2017 the property has served as its administrative headquarters. The building contains employee offices, conference rooms, and meeting spaces. In part, it houses the executive team and senior leadership, researchers, website and publication staff, development staff, membership team, facility operations, human resources, and information technology.

¶ 9    The building is not open to the public without appointment, and the public is not allowed on the surrounding grounds, except for ponds and trails owned by a property association. No direct pediatric care is performed at plaintiff's property, and continuing medical education courses are rarely held there. No employees perform clinical research there, nor does the property have office or laboratory space available to members of the public who wish to perform their own research. There is no process by which members of the public or nonmembers of plaintiff can use the property's office space for their own research.

¶ 10    The building houses an archive and library, which is a resource for members, health care professionals, scholars, and others interested in child health issues and pediatric medicine. Plaintiff makes the library's collection accessible to the public by request or appointment; however, only one member of the public has recently (within several months of the hearing) used the library. The individual requested to use photographs, which required approval by plaintiff's attorneys.

¶ 11    The property also houses a studio to film public service announcements, video clips, and related media. No organizations, businesses, or individuals other than plaintiff occupy or lease any portion of the property. Nor does the property contain a museum that is open for use or access by the public.

¶ 12    Plaintiff has about 480 employees who work in a variety of departments/teams. The teams include: (1) "Healthy Resilient Children, Youth, & Families"; (2) "Global Child Health & Life Support" (*e.g.*, Helping Babies Breath program, vaccinations); (3) "Primary Care & Subspecialty Pediatrics," (*e.g.*, guidelines and standards, including neonatal intensive care unit (NICU) verifications); (4) "Research" (data aggregation rather than clinical research); (5) "Advocacy and External Affairs" (*e.g.*, healthchildren.org, public service announcements, press releases, media requests); (6) "Community & Chapter Affairs & Quality Improvement"; and (7) Education" (*i.e.*, developing educational materials); and (8) "Membership, Marketing & Publishing. About 17 employees work at plaintiff's federal affairs office in Washington, D.C.

¶ 13    Plaintiff is affiliated with state and local chapters that are independently incorporated organized groups of pediatricians and other health care professionals working to achieve plaintiff's goals in their communities. There are 59 chapters in the United States and 7 chapters in Canada.

¶ 14    In addition to its paid staff, plaintiff currently has about 67,000 members, the majority of whom are board-certified pediatricians in the United States. (About 69% of practicing pediatricians are members of plaintiff.) Plaintiff has a broad range of pediatric members, including board-certified pediatricians, candidate members who have not yet passed the boards, residents, medical students, affiliate members, honorary members, and senior members. Membership is available only to members and students of the pediatric profession, not the general public, who pay the membership fee (dues for 2016-17 were generally $650 per year). Over 7600 members (or about 11% of its members) volunteer their time every year to identify issues, develop policies, improve practices, educate the public and pediatricians, and advocate for change. Plaintiff's volunteers serve on committees, councils, or sections, and plaintiff's staff serves these groups in an administrative capacity. Content for healthychildren.org, plaintiff's consumer-friendly website, is

generated by these volunteer groups, and they formulate policies and write for plaintiff's publications. Committee membership is highly sought after, because it has professional benefits. Volunteers are not paid unless they devote more than half of their time to policy development, and less than 5% of volunteers are paid a stipend. About 1000 to 1500 members serve on committees and visit the property.

¶ 15                                B. Finances and Memberships

¶ 16    For the 2016-17 fiscal year, plaintiff's revenue, gains, and other support was $126,638,682, of which $19,632,416 (or 15.5%) was "Government grants (contributions)." Its program service revenue of $85,666,203 (or 68%) was primarily from medical journal sales, membership dues, other publications, continuing medical education courses, and national meetings. Its total expenses were $120,685,639. Plaintiff is not operated for a profit. It maintains about 50% of its annual operating expenses in reserve. Its three largest program services, as measured by expenses and as reported on Form 990, are (1) child health and wellness ($14,484,571, net of a grant) (support to committees, sections, etc., that develop policy statements, clinical and technical reports, and other resource materials); (2) marketing and publications ($13,747,917) (for use by parents, health care professionals, and other parties on topics of child and adolescent health); and (3) medical journals ($10,372,091) (for pediatricians and other allied health professionals).

¶ 17    Plaintiff's charitable contributions are directed via established funds to solicit donations and accomplish various charitable goals. (Plaintiff instructs its members that membership dues cannot be treated as charitable donations.) The Friends of Children Fund is funded strictly by donations and given out for charitable purposes. Most donations are made by members and are considered charitable donations. Over the past 30 years, the fund has received about $400,000 per year in donations. Another fund, Tomorrow's Children Endowment, is funded by donations and

used to fund activities that promote child health care. The Academy Disaster Recovery Fund provides disaster recovery funds. It has about $200,000 or $300,000 in funds, and monies are directed to state chapters.

¶ 18 Plaintiff solicits members by advertising career benefits. Members' dues vary and depend on the length of time that they have been practicing and upon their membership category. Members receive incidental benefits, such as group car-rental rates and "free" or discounted access to certain publications. (Nonmembers pay the full price for plaintiff's publications.) The "FAAP" designation stands for Fellow of the American Academy of Pediatrics, which is available for board-certified pediatricians who are members and pay their dues. The FAAP designation, according to plaintiff's chief executive officer (CEO), Mark Del Monte, can be an asset in a job search and is likely to be put on a member's biography. FAAP pediatricians are listed on the "Find a pediatrician" tool on plaintiff's website. Membership in plaintiff may be terminated if a member fails to pay dues.

¶ 19 Plaintiff does not offer membership dues waivers with its membership solicitation materials. In its dues waiver policy, plaintiff states that requests for waivers must be submitted to the board of directors in writing and that dues waivers will be made "on the basis of severe health or financial exigencies or other special circumstances" and require a two-thirds vote of the board. Financial exigencies "would include significant challenges in financial resources and the ability to meet daily living expenses." For each of the fiscal years 2015-16 and 2016-17, 12% of memberships were discounted and less than 20% of discounted memberships consisted of fully (*i.e.*, 100%) discounted memberships, such as for medical missionaries. (As a result of damage caused by a hurricane, plaintiff waived membership dues in 2017 for its members in Puerto Rico.) The waiver policy is discussed in plaintiff's bylaws, which are posted on its website, aap.org

(where most of the information contained therein, including clinical resources and job listings, is for pediatric professionals). Dues waivers are available to nonmembers who are former members whose memberships lapsed but want to rejoin. New members are not eligible for dues waivers, because plaintiff will not waive dues for pediatric professionals who do not have a history with plaintiff. Waivers are limited to national dues. Separate waivers must be sought for chapter, committee, or section dues.

¶ 20     Plaintiff has no waiver policy for its publications and programs but is open to speaking to people seeking such a waiver, though this is not advertised. Nor does plaintiff advertise any waivers or cost reductions for those who are unable to pay for the publications or courses it offers. Plaintiff educates pediatricians though medical journals, its annual national conference (for which members receive a discount; no process exists for nonmembers to obtain a fee waiver), and continuing education courses (for which nonmembers are charged a higher fee). It also provides the standards for continuing medical education, professional education, and quality of care.

¶ 21     Plaintiff spends about half of its annual funds on employee salaries, benefits, and payroll taxes. (During the 2016-17 fiscal year, plaintiff's salaries for persons identified as officers, key employees, and highest compensated employees ranged from $147,013 to $521,035.) Plaintiff spends the remainder of its funds on publications, continuing medical education and conferences (including a national one for which members receive a discount), grants, and other miscellaneous costs, including travel, accounting, and legal services. For fiscal year 2016-17, plaintiff's combined revenue from "Marketing and Publications" and "Medical Journals" exceeded combined expenses for those categories by $17,148,351. Plaintiff receives about $4.6 million in advertising revenue, including for advertisements posted in its publications. The cost of providing content on

aap.org and healthychildren.org is $1.4 million (1.2% of plaintiff's annual expenditures). The websites generate about 5% of plaintiff's annual revenue.

¶ 22 In years when it has an operating surplus and meets certain charitable and organizational objectives, plaintiff may pay employees a bonus (via its "goal achievement program" (GAP)), which is capped at $2000 plus 5% of eligible wages for meeting membership, clinical, policy, strategic, and financial goals. (Board members are not eligible for a GAP bonus.) Plaintiff benchmarks compensation paid to its 10-member board of directors, officers, and other employees against that of other nonprofits to ensure it is providing market-level compensation. Board members are paid about $55,000 per year for a 17-hour workweek. In 2017, plaintiff's CEO was paid $521,000.

¶ 23                                    C. Activities

¶ 24 Plaintiff's activities fall into three main categories: (1) policy development, (2) education, and (3) advocacy. Generally, it researches issues, develops policies and best practices, provides information to the public and pediatricians, and urges policymakers to improve laws and regulations. Plaintiff's work touches on various aspects of children's health, including childhood immunizations, injury prevention, and protection from the dangers of tobacco and other nicotine products. Further, plaintiff manages community programs that benefit children, such as its disaster recovery fund. One example of its work is that plaintiff partnered with the Centers for Disease Control (CDC) to develop standards and guidelines for NICUs. Plaintiff was also asked to develop and deploy a verification program in certain states to evaluate hospitals' compliance with those standards and guidelines. It charges a fee for training on the standards. Further, plaintiff, with partial funding from federal grants, worked with the Head Start program, which helps disadvantaged children prepare to enter kindergarten. For the 2016-17 fiscal year, the three largest

sources of grants were Health and Human Services Head Start, CDC, and Health and Human Services Maternal and Child Health.

¶ 25    Plaintiff's volunteers develop policy with the support of plaintiff's staff. Plaintiff issues between 60 to 80 new policy statements each year, studies how they are implemented, and issues clinical guidelines to ensure policies are effective in practice.

¶ 26    Plaintiff's educational activities consist of sharing with the public its policies and best practices for the care and safety of children, including through healthychildren.org. The site includes a "Symptom Checker" to help parents determine whether their children's symptoms require medical intervention; also included are causes of common conditions, treatments, and explanations. (Plaintiff also provides a Spanish-language version of the site.) The website received 40.5 million pageviews in 2017 from 25 million users. Plaintiff also distributes free publications, at a direct out-of-pocket cost of $4.8 million for fiscal year 2016-17. Del Monte testified that there are for-profit websites, such as Web MD, that have similar functions to those of healthychildren.org. Plaintiff employs three full-time staff members to administer healthychildren.org.

¶ 27    Plaintiff provides pamphlets, on a range of topics, to pediatricians and others (for a fee; members pay a lower price) for distribution to families and caregivers and creates public service announcements and educational videos that it distributes through radio, television, and the Internet, including YouTube and social media. At aappublications.org, it provides to the public, free of charge, its clinical practice guidelines, clinical reports, and policy statements. Plaintiff also produces a media mailing that summarizes its key forthcoming policy statements and items from *Pediatrics*, its flagship academic-style journal, in a format and language that is media- and consumer-friendly. The mailing is sent weekly to about 1100 media outlets. The subscription price

for *Pediatrics*, per Del Monte, is $204 for nonmembers, and it is free for members (though about $62 of membership fees are for the publication). Plaintiff provides 96 free articles per year for *Pediatrics* at a cost of $66,048. Further, all content is available for free for four years after the initial publication year. The Red Book online, a handbook with comprehensive information—including treatments—about infectious diseases affecting children costs $165. Plaintiff also sells textbooks and access to online medical databases such as *PediaLink*. Members pay a discounted price.

¶ 28     Plaintiff's advocacy activities include drafting and advocating for legislation, providing technical assistance to Congress, providing expert opinion on children's health issues, and pushing for appropriations to support child health research and programs. It advocates before federal executive branch officials and agencies, including the CDC, the National Institutes of Health, the Food and Drug Administration, the Department of Labor, and the Environmental Protection Agency. Plaintiff also files *amicus* briefs in cases affecting children's health, including those involving cigarette warning labels and the regulation of vaping products. It has advocated for better Medicaid reimbursement and for tort reform. Dr. Vera Frances Tait, plaintiff's chief medical officer, testified that "we want the children to get everything that they need. But we also want our members not to just give up and stop practicing out of fear that something might happen." Without reform, she noted, there is a threat to the quality of and access to care. Del Monte testified that preventing drowning or gun violence does not necessarily benefit doctors, but plaintiff advocates for such things in the interest of advancing children's health. Plaintiff does not engage in partisan politics or support candidates for public office.

¶ 29     Del Monte stated that, after moving its headquarters to Itasca, nothing changed as to plaintiff's goals, mission, or activities. "The only thing that changed was our address." According

to Del Monte, plaintiff does not "prevent anyone" from receiving the benefits of its policy development, education, and advocacy work. However, there are restrictions on the general public's reception of those benefits. Dr. Tait testified that plaintiff's only direct service is to provide information, education, and training to pediatric professionals to help them better care for children. Members, in turn, provide direct services to their patients for a fee. Del Monte testified that plaintiff's direct service is to provide education to its members.

¶ 30                           D. Procedural History

¶ 31    On August 29, 2017, the Department granted plaintiff a charitable-use property tax exemption for the Itasca property. The taxing districts objected to the Department's decision, and an evidentiary hearing was held before the ALJ on December 10 and 11, 2019. Three witnesses testified at the hearing: (1) Del Monte; (2) John Miller, plaintiff's chief financial officer (CFO); and (3) Dr. Tait. On June 16, 2020, the Department issued its decision, adopting the ALJ's recommendation and reversing the Department's decision to grant plaintiff the exemption.

¶ 32    Plaintiff requested a rehearing, arguing that the Department's finding on whether it dispenses charity to all who need and apply for it and whether it provides gain or profit in a private sense to any person connected with it was erroneous. Plaintiff argued that the Department should receive into the record the compensation studies and surveys it attached to its petition and rebalance the relevant factors for determining whether an organization is a charitable institution and grant the exemption. On September 15, 2020, the ALJ denied plaintiff's request for a rehearing, finding that, even if a rehearing were granted to allow into evidence the documents concerning *employee/executive* compensation, plaintiff did not meet the factor regarding whether it dispenses charity to all who need and apply for it, and does not provide gain or profit in a private sense to any person connected with it. (The finding that plaintiff's *members* received private gains,

the second prong of the factor, was sufficient, the ALJ noted, to support its determination that the factor was not met.) Plaintiff sought administrative review in the circuit court. On November 10, 2021, the court affirmed the Department's decision. Plaintiff appeals.

¶ 33                                    II. ANALYSIS

¶ 34    Plaintiff argues that the Department's decision was clearly erroneous and requests that we restore its exemption. It maintains that the undisputed testimony was that its activities remain the same as they were at its previous headquarters, which qualified for an exemption, and that the law also remains unchanged. As a result, it contends, the result here should be the same. Plaintiff argues that its focus—to improve children's lives—has always been the same and that the overwhelming evidence showed that the charitable benefits of those activities far outweighed the incidental benefits offered to its members. For the following reasons, we reject plaintiff's arguments.

¶ 35    A Department decision that denies an application for a tax exemption is reviewable as a final administrative decision under the Administrative Review Law (735 ILCS 5/3-101 to 3-113 (West 2020)). 35 ILCS 200/8-40 (West 2020). In administrative review cases, this court's role is to review the decision of the administrative agency, not the decision of the circuit court. *Calvary Baptist Church of Tilton v. Department of Revenue*, 349 Ill. App. 3d 325, 330 (2004).

¶ 36    Statutory exemptions are always construed narrowly and strictly in favor of taxation. *Swank v. Department of Revenue*, 336 Ill. App. 3d 851, 855 (2003). "The party claiming an exemption carries the burden of proving clearly that the use of the subject property is within both the constitutional authorization and the terms of the statute under which the claim of exemption is made." (Emphasis omitted.) *Oswald v. Hamer*, 2018 IL 122203, ¶ 18; see also *Evangelical Hospitals Corp. v. Department of Revenue*, 223 Ill. App. 3d 225, 231 (1991) (the taxpayer seeking the exemption bears the burden of proving by clear and convincing evidence that the exemption

applies). "[T]he fact that a taxpayer has received a tax exemption on its property for a prior tax year does not demonstrate that it is entitled to tax exempt status in a subsequent year." *Metropolitan Water Reclamation District of Greater Chicago v. Department of Revenue*, 313 Ill. App. 3d 469, 479-80 (2000).

¶ 37　　Generally, when an administrative agency's decision involves a pure question of law, we review it *de novo*. *Skokie Firefighters Union, Local 3033 v. Illinois Labor Relations Board, State Panel*, 2016 IL App (1st) 152478, ¶ 11. When reviewing purely factual findings, the agency's findings and conclusions are deemed to be *prima facie* true and correct (735 ILCS 5/3-110 (West 2020)) and, thus, are reviewed under the manifest-weight-of-the-evidence standard. *Skokie Firefighters Union*, 2016 IL App (1st) 152478, ¶ 11. When an agency's decision presents a mixed question of law and fact, it will be overturned on appeal only if it is clearly erroneous. *Village of North Riverside v. Boron*, 2016 IL App (1st) 152687, ¶ 14; see *Midwest Palliative Hospice & Care Center v. Beard*, 2019 IL App (1st) 181321, ¶ 19 (whether property is used for an exclusively charitable purpose is a mixed question of law and fact). "An administrative decision is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50. "While this standard is highly deferential, it does not relegate judicial review to mere blind deference of an agency's order." *Board of Trustees of the University of Illinois v. Illinois Labor Relations Board*, 224 Ill. 2d 88, 98 (2007).

¶ 38　　Generally, article IX of the 1970 Illinois Constitution (Ill. Const. 1970, art. IX) subjects all real property to taxation. *Oswald*, 2018 IL 122203, ¶ 12. Section 6 of article IX allows the legislature to exempt property from taxation if, among other things, it is "used exclusively for ***

charitable purposes."[2] Ill. Const. 1970, art. IX, § 6. The provision is not self-executing but authorizes the legislature to enact legislation providing for an exemption. *Oswald*, 2018 IL 122203, ¶ 13.

¶ 39　　In section 15-65 of the Property Tax Code, the legislature used its power to exempt certain property from taxation, specifically, property that is "actually and exclusively used for charitable or beneficent purposes, and not leased or otherwise used with a view to profit," a provision that is derived from the constitutional requirement. 35 ILCS 200/15-65 (West 2020). Further, section 15-65(a) requires that the property be owned by, as relevant here, an "[i]nstitution[ ] of public charity." *Id.* § 15-65(a). Thus, to qualify for a property tax exemption, the statute requires that the property (1) is used exclusively for charitable purposes and (2) is owned by an institution of public charity.

¶ 40　　　　　　　　　　　　A. Charitable Purpose/Use

¶ 41　　Plaintiff argues that its property is used exclusively to carry out its charitable mission of improving children's health. It notes that it does not lease any portion of its headquarters and uses it only for activities that advance its charitable mission, not those intended to generate a profit.

¶ 42　　As noted, an organization seeking an exemption under section 15-65 must establish that the property at issue is "actually and exclusively used for charitable or beneficent purposes, and not leased or otherwise used with a view to profit." *Id.* § 15-65. In this context, the term "exclusively used" means that charitable or beneficent purposes are the *primary* ones for which

---

[2]Because the phrasing of this section is similar to that in the 1870 Illinois Constitution, case law interpreting permissible legislative exemptions under the 1870 Constitution is relevant to interpreting the 1970 Illinois Constitution. *Eden Retirement Center, Inc. v. Department of Revenue*, 213 Ill. 2d 273, 286 (2004).

the property is utilized and not any secondary or incidental purpose. *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d 149, 157 (1968) (*Korzen*). In *Korzen*, the supreme court stated that "a charity is a gift to be applied, consistently with existing laws, for the benefit of an indefinite number of persons, persuading them to an educational or religious conviction, for their general welfare[, ]or in some way reducing the burdens of government." *Id.* at 156-57. Although there is no requirement that there be a direct correlation between the value of an exemption and the value of goods or services provided by the charity, "it is a *sine qua non* of charitable status that those seeking a charitable exemption be able to demonstrate that their activities will help alleviate some financial burden incurred by the affected taxing bodies in performing their governmental functions." *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 395 (2010). "The critical issue is the use to which the property itself is devoted, not the use to which income derived from the property is employed." *Id.* at 403.

¶ 43　　Here, the Department found that plaintiff's purpose aligns primarily with the membership's interest. Although plaintiff provides some direct public benefit in free content sharing on healthychildren.org and through print publications in a limited capacity, such benefits, the Department determined, generate publicity and goodwill, along with exclusive membership benefits. Many of its membership benefits, the Department noted, are "rooted in the same activity and enhanced through public sharing." Plaintiff, it found, is organized to mutually benefit the public and its membership, "but its success depends significantly on a wide content sharing by which it increases its revenue, exposure, and patient referrals to the membership." The membership benefit is primary, and its membership solicitations make clear the exclusive membership benefits included in the dues, which it advises are business expenses and not charitable donations.

¶ 44    The Department also noted that it was questionable whether plaintiff's content sharing could even be a community benefit, where plaintiff generates significant revenues from selling publications and ads, both print and digital. Its consumer-friendly website, healthychildren.org, links to "Shop AAP" on plaintiff's main website, aap.org, where ads and publications are sold. The revenue from publication sales linked to the consumer-friendly site is more than 5% (or $6.3 million) of plaintiff's annual revenue. Plaintiff's online and print ad revenue totals $10 million. Also, it receives $300,000 to $400,000 in corporate sponsorships on the site. The Department found that this is no different from a commercial website, where content is provided to attract consumers and generate revenue via selling ads, products, or consumer data. Miller, the CFO, testified that the website is consumer focused. According to the Department, "[t]hat is not charity but a business model."

¶ 45    Addressing plaintiff's advocacy, the Department determined that it was often conducted at the state level by state chapters independent of plaintiff, although there was some coordination. However, even if the advocacy work could be attributed to plaintiff with no direct benefit to its membership, the Department noted, members "benefit from publicity and goodwill. Importantly, there is no detriment to [plaintiff's] membership."

¶ 46    The Department also addressed situations where there might be a conflict between the interests of children and the membership and determined that, "when their interests diverge, [plaintiff] has prioritized the membership interest." It noted that plaintiff advocates for medical tort reform to limit liability and statutes of limitation, "at a detriment to the children who suffer injuries from medical malpractice." The Department also noted Dr. Tait's testimony that tort reform reduced frivolous lawsuits, which she believed, based on member feedback, may limit

access to pediatricians if left unaddressed. In light of the foregoing, the Department found that plaintiff did not present clear and convincing evidence on this issue.

¶ 47  Finally, the Department found that assisting all pediatricians, regardless of membership, would be more consistent with plaintiff's mission. However, plaintiff "exists primarily due to mutual interests of the 67,000 dues paying members to promote the pediatric profession with exclusive membership benefits, some of which are intertwined with a secondary or 'community benefit' to the public."

¶ 48  Here, plaintiff first argues that its property is used exclusively to carry out its charitable mission of improving children's health. It does not lease any portion of the property and uses its headquarters only for activities that advance its charitable mission, not for activities intended to generate a profit. It contends that it provides extensive direct and free benefits to children and society. Plaintiff also asserts that its healthychildren.org website is charitable because, although it generates limited advertising revenue, there is no profit motive with respect to the advertising, the site is free to the public, and the limited advertising revenue is used to support plaintiff's charitable activities.

¶ 49  Addressing its advocacy for medical tort reform, plaintiff argues that carefully crafted tort reform increases children's access to medical care, because it keeps insurance costs and liability exposure from driving pediatricians out of the field. Thus, there is no conflict between the interests of its members and the children they serve. Also, plaintiff notes that it supports greater Medicaid reimbursement for the same reason. If Medicaid does not sufficiently reimburse pediatricians, many children who rely on Medicaid will suffer. Addressing the broader issue of its members' financial interests, it contends that members do not financially benefit from plaintiff's efforts to improve children's health, because healthy children require less care than sick ones do.

¶ 50 Plaintiff also takes issue with the Department's focus on incidental member benefits, arguing that they do not drive either its mission or its activities. Plaintiff asserts that it does not develop policies, educate, or advocate in order to serve its members and contends that it disseminates its work product to everyone who will listen. It faults the Department for focusing on the "narrow" questions of who can obtain discounts on publications or reduced fees for education programs. Plaintiff contends that those benefits to members are not its focus and do not outweigh the far reaching and life changing efforts it makes on behalf of children.

¶ 51 We conclude that the Department's decision was not clearly erroneous. Plaintiff's property is not generally open to the public other than by appointment. About 480 staff members work at the property, which contains employee offices, conference rooms, meeting spaces, the archive/library, and a studio. No direct pediatric care is performed at the property, continuing medical education courses are rarely held there, no employees perform clinical research at the property, as plaintiff's research consists of data aggregation, and the property does not have office or laboratory space available to members of the public who wish to perform their own research.

¶ 52 The property houses plaintiff's executive team and senior leadership, researchers, website and publication staff, development staff, and membership team, among others. Employees at the property work in various areas, including (1) "Healthy Resilient Children, Youth, & Families"; (2) "Global Child Health & Life Support" (*e.g.*, Helping Babies Breath program, vaccinations); (3) "Primary Care & Subspecialty Pediatrics," (*e.g.*, guidelines and standards, including neonatal intensive care unit (NICU) verifications); (4) "Research" (data aggregation rather than clinical research); (5) "Advocacy and External Affairs" (*e.g.*, healthchildren.org, public service announcements, press releases, media requests); (6) "Community & Chapter Affairs & Quality

Improvement"; and (7) Education" (*i.e.*, developing educational materials); and (8) "Membership, Marketing & Publishing.

¶ 53    Plaintiff's staff also serves member volunteers in an administrative capacity. Indeed, plaintiff relies on thousands of volunteers to formulate its standards and policies, but that work, even if it is charitable, is not conducted at the property. Further, content for healthychildren.org, its consumer-friendly website, is generated by these volunteer groups, and they formulate policies and write for plaintiff's publications, none of which occurs at the site.

¶ 54    We are not left with a definite and firm conviction that the Department erred in determining that plaintiff's property is not "exclusively used" for charitable purposes; the primary purpose for which the property is used is as the administrative headquarters for plaintiff, which directly serves its 67,000 members (who do not work at the property) and more broadly serves the pediatric profession by setting professional standards and best practices, providing education, and advocating for the population the profession serves—children. *Korzen*, 39 Ill. 2d at 157 ("exclusively used" means charitable or beneficent purposes are the primary ones for which the property is used, not any secondary or incidental purpose). This primary purpose is not charitable or beneficent, it does not benefit an indefinite number of persons, and it does not reduce the burdens of government.

¶ 55    Several cases are instructive. We begin with three cases where the courts determined that the subject properties were not entitled to exemptions. In *American College of Chest Physicians v. Department of Revenue*, 202 Ill. App. 3d 59, 62 (1990), the plaintiff was an international nonprofit medical society with 13,000 members that provided continuing education to heart and lung disease practicing specialists and physicians. It also was the primary source of postgraduate education in pulmonary medicine. One-third of the plaintiff's revenue came from membership dues, one-third

from fees for its courses and annual meeting, and one-third from advertising in its monthly journal. It also received $500,000 in grants. Its building was staffed by 42 employees, and it housed a library. Members and nonmembers used the library, as did the general public. The plaintiff also maintained a videotape library and rented the tapes to the public for the cost of mailing. It produced audiotapes on the diagnosis, treatment, and prevention of heart and lung disease, which were available for purchase by physicians and members of the public who were not physicians. The plaintiff also maintained an educational fund that was created by voluntary member donations. It provided three $18,000 grants per year and $70,000 per year for a teaching research grant. Also, for a fee, the plaintiff offered physicians continuing medical education courses that were conducted at hospitals and medical centers around the country. Most of the courses were for physicians, but at least one course per year was for nurses and similar professionals. The State of Illinois did not offer any continuing medical education, and it was not required in this state.

¶ 56    The reviewing court held that the plaintiff did not qualify for an exemption. *Id.* at 67. Addressing charitable purpose/use, the court cited the director's testimony concerning fellowships and grants—which was ambiguous and incomplete and related that the plaintiff provided only one $70,000 teaching research grant per year—and the fact that the library was primarily used by the plaintiff's staff. The court determined that this evidence did not show that the plaintiff's property was primarily used for a charitable purpose. *Id.* at 68. Also, the plaintiff did not accredit hospitals, its programs were directed toward its members and other doctors, and its facilities were not used by the public. *Id.* at 68-69.

¶ 57    Here, plaintiff's archive/library, like that in *American College of Chest Physicians*, is generally not open to the public or used by it. Also, plaintiff's provision of grants is not significant when compared to its other expenditures. Plaintiff's programming and publications are primarily

directed toward its members, who pay discounted fees for them, and plaintiff's building is not open to the public without appointment.

¶ 58    In another case, *Du Page County Board of Review v. Joint Comm'n on Accreditation of Healthcare Organizations*, 274 Ill. App. 3d 461, 469 (1995), the plaintiff nonprofit corporation, whose members included various medical and dental professional organizations, sought an exemption for its property. The plaintiff developed standards of accreditation for health care organizations, performed on-site evaluations of the organizations, decided whether to issue those organizations certificates of accreditation, and made recommendations for improvements in standards compliance. It also performed research to refine its standards to maintain and improve the quality of care, conducted surveys of health care programs, and provided educational services for health care professionals. It answered questions and provided free information to anyone who called, published material to educate providers, and offered on-site technical assistance so that health care organizations could improve their effectiveness.

¶ 59    Addressing charitable purpose/use, this court held that the plaintiff did not primarily use its property for a charitable purpose but, instead, used it to benefit health care providers for a fee. *Id.* at 472. The property was used exclusively as the administrative offices for plaintiff's work, fees were charged for each service it supplied, and there was no evidence that any provisions were made for waivers or reductions in fees under any circumstances. *Id.*

¶ 60    This case is similar to *Joint Comm'n* because plaintiff's headquarters is used for administrative purposes; it charges the public higher fees for publications, conferences, etc.; and its waiver policies for members exist for limited categories of services/benefits, are not widely advertised, and are granted under very limited circumstances.

¶ 61    In the final case, *Provena Covenant Medical Center*, upon which the Department relied, a hospital corporation, Provena Hospitals, sought an exemption for one of the six hospitals it operated, Provena Covenant Medical Center (PCMC) PCMC had 1000 employees, 400 volunteers and 200 physicians. PCMC's complex consisted of 43 real estate parcels. The physicians were not employed or paid by PCMC, and the emergency department and other services were operated by third parties. PCMC's employees were paid for their services, and senior executives' compensation was compared against national surveys and benchmarked. Virtually none of its income came from charitable contributions, and its patients fell into three categories: those with private health insurance, the uninsured, and those on Medicare or Medicaid. Its participation in Medicare and Medicaid qualified it for a federal tax exemption and provided it a steady revenue stream, though there was a gap between the payments received and the costs of care for such patients. None of PCMC's advertising mentioned free or discounted medical care. PCMC referred accounts to collections after balances were not paid after three or four statements were sent. It had a charity care policy in place, but it required an application using federal poverty guidelines as eligibility criteria, along with the value of an applicant's assets. It treated its charity care policy as a payer of last resort. Aid provided under the program for one year was "modest." *Provena Covenant Medical Center*, 236 Ill. 2d at 381. Further, the number of patients benefiting from the charitable care program was small, consisting of only 302 of its 10,000 inpatient admissions and 100,000 outpatient admissions.

¶ 62    The supreme court held that Provena Hospitals was not entitled to an exemption for PCMC. *Id.* at 394. Addressing charitable purpose/use, the court held that Provena Hospitals did not meet this element, because both the number of uninsured patients receiving free or discounted care and the value of the care they received at the property were *de minimis*, especially as compared to the

number of county residents with incomes below federal poverty guidelines. *Id.* at 397-99. Although no one was turned away from PCMC based on their inability to demonstrate how the costs of care would be paid, Provena Hospitals did not advertise the availability of charitable care, patients were billed, and unpaid bills were referred to collection agencies. *Id.* at 397-98. Also, the charitable care program was a payer of last resort. *Id.* at 380, 398. Thus, the court concluded, little distinguished Provena Hospitals provision of charity from a for-profit institution's writing off bad debt. *Id.* at 398. Provena Hospitals' claims of charitable purpose/use were also undermined by its charging rates to uninsured patients more than double the actual cost of care and the fact that discounts were offset by surpluses generated by higher charges to other users of its facilities. *Id.* at 400. Further, discounted care provided to Medicare and Medicaid patients provided Provena Hospitals with revenue and favorable tax treatment and did not constitute charity. *Id.* at 401-02.

¶ 63    Here, plaintiff, like Provena Hospitals in *Provena Covenant Medical Center*, conducts few activities at the property that are discounted or free, and it does not openly advertise its membership fee waivers. Plaintiff also does not have a waiver policy in place for the cost of its publications or programs, and separate waivers must be sought for chapter, committee, or section dues. Only 15.5% of plaintiff's revenues, gains, and other support come from government grants/contributions and 68% come from medical journal sales, membership dues, other publication sales, courses, and meetings. Its three largest program services are child health and wellness ($14.5 million), marketing and publications ($13.7 million), and medical journals (over $10 million). And it distributes free publications at a direct cost to it of only $4.8 million; its total expenses are over $120 million.

¶ 64    Indeed, the supreme court has defined a "charity," in part, as a "gift." *Korzen*, 39 Ill. 2d at 156-57. The record amply showed that plaintiff's activities at its property do not constitute gifts.

It primarily serves its members, who pay a fee for certain professional benefits associated with membership. Publications, conferences, and courses are not provided for free, and membership dues waivers, as noted, are rarely granted (only 12% of memberships are discounted, and less than 20% of discounted memberships are fully discounted) and unavailable in certain circumstances (*e.g.*, to new members).

¶ 65    Two cases that illustrate where charitable purpose/use was found are distinguishable. In *Arts Club of Chicago v. Department of Revenue*, 334 Ill. App. 3d 235, 237 (2002), the plaintiff was an organization established in 1916 to bring modern and avant-garde art to Chicago and to provide a place where artists and art lovers could meet. Its collection consisted of art and literary works that were not duplicated at other museums, and it periodically presented concerts, lectures, and performances. The plaintiff's building had recently been constructed on land purchased with some of the $12 million proceeds from the sale of a sculpture to the Art Institute of Chicago. The plaintiff created an endowment fund with the proceeds, some of which remained and provided investment income to finance current operations after the purchase of the land. (The plaintiff's new building was financed by the issuance of bonds.) The first floor of the building consisted of galleries, offices, a library, a small dining room, and other rooms. The second floor had a reception area, auditorium, stage, dining room, and kitchen. The dining and kitchen areas comprised about 14% of the building's total area. About 90% of the organization's 100 permanent works of art were displayed throughout the building, including the dining rooms and restrooms. The building was open to the public at no cost Monday through Saturday for five to seven hours, and a sign on the door reflected that it was open to the public. The plaintiff advertised that it was free of charge, contacted area schools to encourage students to visit, and advertised music and lectures, which were open to the public and half of which were free (with the remaining programs having a $10

admission fee). The dining room was open for lunch on weekdays to club members and their guests, but nonmembers could enter to view the permanent collection there during any time the building was open. The plaintiff did not generate a profit through its dining room. About 4300 visitors in the walk-in/student category visited over a 2½ year period and over 68,000 visitors in the dining/events/parties category. Board members and executive committee members served without compensation or expense reimbursement, as did officers who oversaw daily operations. The plaintiff did have salaried employees, including its director and chef. The plaintiff had 849 members, and one became a member by being sponsored by a member and seconded by two members who personally knew the applicant. In addition, two letters of recommendation were required, and the membership committee voted on the applicant. The plaintiff's bylaws allowed for waiver of membership fees in cases of hardship, but this was not noted on membership applications and was subject to veto by the president. The plaintiff had no capital stock or shareholders, and it did not pay dividends. About 25% of its funds came from dues and fees, 2% from food service revenue, and 73% from investment income.

¶ 66    The reviewing court held that the plaintiff's purpose was to benefit the community as a fine art museum, and it reversed the Department's decision to deny an exemption. *Id.* at 251. Addressing charitable purpose/use, the court noted that relevant considerations included the percentage of total visitors who used the plaintiff for its stated purpose, the percentage of the property allocated and used for that purpose, and the amount of time that portion of the property was used for that purpose. *Id.* at 249. The building was used primarily for charitable purposes—to display the permanent collection and temporary exhibits, host art events open to the public, and oversee the plaintiff's operation/administration. *Id.* at 249-50. It was also open to the public during the day and for evening events that were advertised. *Id.* at 250. The dining room was open for only

two hours and only members and their guests could eat there, but it comprised only 14% of the building's space. *Id.* It was open to nonmembers, though, to view the permanent collection any time the building was open to the public. *Id.* The allocation of space and the amount of time the building was open to the public showed that the plaintiff primarily used its property for its stated charitable purpose. *Id.* The dining and social function of the organization was secondary to this purpose. *Id.* The court also addressed the plaintiff's membership structure and concluded that the fees and dues paid by members were a source of revenue that the plaintiff used to support its daily activities and, therefore, they contributed to its charitable use. *Id.* Finally, although membership applications did not advertise the fee waiver policy, it was exercised such that fees were not a financial barrier to those interested in membership. *Id.*

¶ 67     In stark contrast to this case, the public in *Arts Club of Chicago* had wide access to the subject property. Via signage on the door, the plaintiff welcomed the public to its property, most of which was allocated to displaying to the public, for free, its art collection and hosting events, many of which were also free. Here, the public does not have access to plaintiff's property, and its activities are primarily directed to its members. Also, as noted, the dues waiver policy is not exercised such that fees are not a financial barrier to those interested in membership. Finally, plaintiff's direct or immediate purpose is to serve its membership, not the public or children.

¶ 68     In the second case, *American College of Surgeons v. Korzen*, 36 Ill. 2d 340, 343-44 (1967) (*American College of Surgeons*), *overruled on other grounds by Christian Action Ministry v. Department of Local Government Affairs*, 74 Ill. 2d 51, 57 (1978), upon which plaintiff relies, the plaintiff nonprofit corporation was established as an association of surgeons to advance the science of surgery; establish standards for hospital construction, administration, and equipment; engage in scientific research; aid in the instruction of doctors; and formulate standards of medicine and

methods for the improvement of adverse conditions surrounding the ill. The plaintiff had 26,000 members. The first floor of its building contained a library and a museum, both of which were open to, and used by, the general public. It maintained a library of several hundred surgical films that were available to medical personnel for a fee to cover postage and insurance. Its committees formulated standards for cancer treatment facilities, and it inspected and accredited both public and private hospital facilities. The cancer program was not duplicated by any public or private agency, and there was no charge for the survey or approval of facilities. Single copies of its cancer program manual were offered for no charge, and the program received financial support from both public and private charities. The plaintiff's trauma committee conducted programs for doctors, hospital administrators, and the general public in the treatment and prevention of injuries and published pamphlets and handbooks, many of which were available for no charge. Its educational program for pre and postoperative care offered scholarships to support the training of young surgeons and provided special surgical residency training not provided by medical schools. The plaintiff also organized and administered scientific meetings for medical personnel, as well as an annual clinical congress that was open to attendance by both members and nonmembers. Doctors applied for membership in the plaintiff, the plaintiff had no capital stock or shareholders and had never declared dividends, and both members and nonmembers paid the same subscription price for its scientific journal. About one half of the plaintiff's funds came from members' dues.

¶ 69     The supreme court affirmed the exemption of the plaintiff's property. *Id.* at 349. Although not addressing charitable purpose/use separately from the question whether the plaintiff was a charitable institution, the court determined that the plaintiff made benefits available to the public "to the greatest extent possible," even though many of its programs were attended primarily by medical professionals. *Id.* at 348. Further, people beyond its members benefited. *Id.* The plaintiff's

library, publications, training, educational, and accreditation programs relieved, to some extent, the burden on government. *Id.* at 348-49.

¶ 70     Here, in contrast, plaintiff's archive/library is not generally open to or even used by the public, nor are its headquarters and property open to the public without appointment. Further, plaintiff charges nonmembers a higher rate for its publications and conferences. Also, in contrast to *American College of Surgeons*, plaintiff charges to teach standards, specifically those for NICUs.

¶ 71     In summary, the Department did not err in determining that plaintiff's property is not used exclusively for charitable purposes.

¶ 72             B. Institution of Public Charity/Charitable Ownership (*Korzen* Factors)

¶ 73     In *Korzen*, the supreme court set forth the framework for determining whether an organization is a *charitable institution* and, therefore, exempt from taxation under section 15-65. *Korzen*, 39 Ill. 2d at 156-57. The court identified the following five factors, commonly referred to as the *Korzen* factors:[3] (1) the benefits derived are for an indefinite number of persons for their general welfare or in some way reducing the burdens on government; (2) the organization has no capital, capital stock, or shareholders and earns no profits or dividends; (3) funds are derived mainly from private and public charity and are held in trust for the objects and purposes expressed in its charter; (4) it dispenses charity to all who need it and apply for it, and it does not provide

---

[3]Courts vary in their grouping and count of the *Korzen* factors, separating them into either five or six factors, and in whether they address charitable purpose/use within their analysis of the *Korzen* factors. For consistency and because it most closely follows *Korzen*, we have followed the ALJ's organizational scheme.

gain or profit in a private sense to any person connected with it; and (5) it does not appear to place any obstacles in the way of those who need and would avail themselves of the charitable benefits it dispenses. *Id.* at 157. The *Korzen* factors are guidelines, not strict requirements, that courts consider and balance by examining the facts of each case. *Joint Comm'n*, 274 Ill. App. 3d at 469.

¶ 74    1. Benefits Derived for Indefinite Number or Reduce Burdens on Government

¶ 75    The Department found that the first *Korzen* factor—that the benefits derived are for an indefinite number of persons for their general welfare or in some way reduce the burdens on government—was not met. It determined that, as a membership organization, plaintiff does not benefit an indefinite number of persons. Plaintiff's primary benefits, the Department determined, are reserved only for the membership, with a secondary benefit to the public. "The public benefit from presumably well-trained [plaintiff] members seeing their patients for a fee is indirect and cannot be attributed to [plaintiff]." The "indirect public benefit is the result of work, not charity, rendered by [plaintiff] members receiving education and training, who would continue to work as pediatricians, as nonmember pediatricians do, without or without [plaintiff]. This is not charity, nor can it be attributed to [plaintiff]."

¶ 76    Addressing plaintiff's content sharing, the Department found that most of plaintiff's services are for a fee and that only 5.8% of its revenue is given as a secondary or community benefit that generates publicity and goodwill for plaintiff—$4.8 million in direct costs of its free publications and websites. The Department also noted that no specific government burden is reduced by the promotion of the pediatric profession by assisting and educating plaintiff's membership, which is plaintiff's primary purpose. The secondary or community benefit plaintiff provides is not charity, it determined, "but more like a business model. As commendable as

[plaintiff's] work is benefitting the children globally, there is likewise no such government burden."

¶ 77 Plaintiff argues that it satisfied this factor because its activities, which include developing evidence-based policies, educating the public about children's needs, and promoting their health and welfare, benefit an indefinite number of people. Government agencies, it contends, rely on it to help them perform their functions. The limited benefits it provides its members, plaintiff argues, are incidental and dwarfed by the contributions it makes to the public good. It also contends that member benefits are not its primary purpose. It argues that the Department ignored the volunteer work of its members, which is essential in carrying out plaintiff's work.

¶ 78 Plaintiff also argues that it reduces the government's burden because the government relies on it to help fulfill its duties (such as Medicaid and Head Start). It contends that, if the government could perform these functions, there would be no reason to give grants to plaintiff. Finally, plaintiff argues that *Provena Covenant Medical Center*, upon which the Department relied, is distinguishable, because the hospital in that case overwhelmingly operated to generate profit, whereas plaintiff's activities are not carried out for profit and benefit children, not its members.

¶ 79 We conclude that the Department did not err in assessing this factor. Plaintiff is a membership organization designed to serve its members, who directly benefit from its activities. Any benefits to the public are indirect, and plaintiff's activities do not reduce the burdens of government because there is no requirement for governmental entities to provide, for example, continuing medical education. Compare *id.* (factor not met where the plaintiff hospital accreditation organization's work provided only an indirect benefit to an indefinite number of persons and where the direct beneficiaries of its work were health care providers who, when accredited by the plaintiff, were able to receive reimbursement from public and private funding

sources), and *American College of Chest Physicians*, 202 Ill. App. 3d at 66-67 (public did not directly benefit by the plaintiff medical society's courses, but, rather, its members and other doctors who took courses benefitted, and any benefit to the public was indirect; the plaintiff's activities did not reduce burdens of government, because there was no burden on the government to provide continuing medical education, as no Illinois law required continuing medical education), with *Arts Club of Chicago*, 334 Ill. App. 3d at 244 (factor met where the plaintiff arts club regularly gave the general public the opportunity to view its permanent art collection and temporary exhibits, as well as the opportunity to attend art programs and events it hosted; a party need not "make available every conceivable benefit it offers, however incidental to its primary purpose, to an indefinite number of people"; rather, focus is on whether it benefits an indefinite number of people). Further support for the Department's determination that plaintiff does not relieve the burdens of government is that plaintiff does not gratuitously provide its services to the government and thereby relieve any governmental burdens; rather, it receives compensation from the government to provide expertise for certain programs that serve children. See *Provena Covenant Medical Center*, 236 Ill. 2d at 396-97 (noting that, even if the plaintiff hospital corporation provided the types of services that lessened the burdens of the local taxing bodies, the terms of the service were relevant and payment for services rendered did not relieve governmental burdens).

¶ 80                      2. No Capital, Capital Stock, or Shareholders

¶ 81    The Department found that the second *Korzen* factor—that the organization have no capital, capital stock, or shareholders and earns no profits or dividends—was satisfied, and the parties agree that plaintiff meets this factor.

¶ 82                      3. Mainly Derives Funds From Charity and Holds in Trust

¶ 83    The Department determined that the third *Korzen* factor—that funds are derived mainly from private and public charity and are held in trust for the objects and purposes expressed in the organization's charter—was not met. It acknowledged that there is no threshold percentage of funding by charitable contributions to meet this factor. However, because 68% of plaintiff's revenue is derived from membership dues, publication sales, advertisements, and program fees, it determined that the factor was not met. Further, plaintiff's funds, the Department found, are held and used for purposes expressed in its charter but are used for noncharitable purposes.

¶ 84    Plaintiff argues that it met this factor, because it receives more of its revenues from public and private charity than from any other source and all of its funds are held in trust to fulfill its charitable mission. Specifically, contributions and grants are its single largest source of funding, and, although it receives the majority of its funding from sources other than grants or charitable contributions, it maintains that it is a charity. Plaintiff argues that the fact that it receives some revenue from membership dues and a small amount from investment income does not mean it is not a charity. As to the second prong of this factor—that the funds are held in trust for objects and purposes expressed in the organization's charter—plaintiff asserts that the Department erred in finding that the objects and purposes expressed in its charter are not charitable. It contends that the word "charity" need not appear in its charter and that it uses all its revenue for charitable activities, as required by federal law and as shown on its Form 990.

¶ 85    We conclude that the Department did not err in determining that this factor was not met. Over 68% of plaintiff's revenue comes from noncharitable sources, including membership dues, publications, and advertisements. Compare *American College of Surgeons*, 36 Ill. 2d at 348 (the plaintiff was properly found to be a charitable institution, although over half of the plaintiff's funds came from membership dues, with *Alivio Medical Center v. Department of Revenue*, 299 Ill. App.

3d 647, 651-52 (1998) (affirming denial of exemption where 59% of the plaintiff ambulatory medical care facility's income came from patient fees); see also *Provena Covenant Medical Center*, 236 Ill. 2d at 392-93 (factor not met, where the plaintiff hospital corporation's funds were "overwhelmingly" generated by providing medical services for a fee); *Joint Comm'n*, 274 Ill. App. 3d at 471 (factor not met where the plaintiff hospital accreditation organization's primary source of funds was fees from its surveys, publications, and programs, which were not provided to those who were unable to pay the fees). But see *Arts Club of Chicago*, 334 Ill. App. 3d at 244-45 (prong met where the plaintiff arts club's funding primarily derived from investment income in an endowment fund created with the proceeds from the sale of an artwork it had acquired with donated funds). Further, the Department acknowledged that the revenue source is not the sole determining factor in finding an organization is charitable and that the totality of the factors would be balanced. See *American College of Surgeons*, 36 Ill. 2d at 348 ("where it is established that the funds and property are devoted to public purposes, the source of the funds is not the sole determinant factor"). As to the second prong of this factor, we conclude that the Department did not err in its assessment. Plaintiff holds its funds in trust for the objects and purposes expressed in its charter, but, as the Department correctly determined, they are used for noncharitable purposes.

¶ 86          4. Dispenses Charity to All and Does Not Provide Gain/Profit

¶ 87    The fourth *Korzen* factor—the organization dispenses charity to all who need it and apply for it and it does not provide gain or profit in a private sense to any person connected with it—was not met.

¶ 88    As to the first prong of this factor, the Department found that plaintiff's membership benefits are primary and exclusive and unavailable to the public. Further, they are not additional or incidental benefits above and beyond what is offered to the public. Plaintiff, the Department

found, "is clearly a membership organization and its primary benefits are not universally dispensed to all who need and apply for [them]."

¶ 89    Plaintiff argues that it met the first prong, because it provides direct and free benefits to the public, its efforts benefit all children, and the benefits from its activities reach children throughout the world. Children receive its charity, it asserts, on a self-executing basis: educational and advocacy efforts to improve child health and welfare relating to car seats, immunizations, drowning prevention, teen suicide, and electronic nicotine delivery systems benefit children without the need to apply for those benefits. It also contends that it provides millions of dollars in free educational materials. Plaintiff argues that the Department incorrectly focused on incidental membership benefits and overlooked its charitable activities.

¶ 90    We conclude that the Department did not err in determining that plaintiff did not meet this prong. Plaintiff is a membership organization, and it does not dispense its benefits to all who need and apply for them. Plaintiff primarily and directly serves its members, and membership benefits are unavailable to the public. And other benefits, such as publications and courses, are provided to members at a reduced cost. We disagree with plaintiff that its circumstances are like those in *Arts Club of Chicago*. In that case, this prong was undisputed, and the Department conceded that the plaintiff opened its doors to the public for free during certain hours. *Arts Club of Chicago*, 334 Ill. App. 3d at 246. Also, the court noted that the plaintiff exercised a dues waiver policy and, although it did not advertise it, it waived admission fees for those unable to pay. *Id.* The access and benefits provided to the public in *Arts Club of Chicago* are not present here. See *Joint Comm'n*, 274 Ill. App. 3d at 471 (factor not met where the plaintiff hospital accreditation organization charged a fee for the services it provided; rejecting the ALJ's determination that, because the plaintiff provided a benefit to the public as a whole rather than to particular individuals, this factor was not relevant);

*American College of Chest Physicians*, 202 Ill. App. 3d at 67 (prong not met where the plaintiff medical society's fellowships and grants and its library—which was primarily used by its staff and no evidence reflected the number of members of the public who had used it—did not provide benefits to the general public and where its teaching and training benefitted only a limited number of people—its members and other doctors who took its courses).

¶ 91    Next, addressing the second prong of this factor, the Department determined that plaintiff failed to show that it did not provide gain or profit in a private sense to any person connected with it. The Department referenced Miller's testimony that employee compensation, including the GAP bonus, is benchmarked by compensation surveys and is comparable to similar organizations. However, the Department noted that neither the compensation survey nor the study itself were contained in the record and that, without such corroborating evidence, it could not find that there was no evidence of private gain to plaintiff's employees with the highest salary of $521,000 in 2017. The Department also determined that there were private gains to plaintiff's members, including through such exclusive membership benefits as education, training, use of the FAAP designation, patient referrals, networking, committee appointments, and discounts for plaintiff's programs and publications. "Some are quantifiable gains, some are less so, but there can be no reasonable dispute that these are private gains to [plaintiff's] membership not available to non-members." The Department rejected the premise that the benefits are paid for by membership dues, finding that the sum of the membership discounts exceeded membership dues.

¶ 92    Plaintiff contends that the Department applied the wrong legal standard when it determined that plaintiff did not corroborate its evidence concerning the compensation surveys. Neither the ALJ nor the taxing districts, it notes, argued that plaintiff did not conduct the surveys or that the studies did not say what Miller and the tax filings stated that they did. Nor did they assert that the

studies were essential to establishing the fourth factor. Further, plaintiff argues that the Department erred in finding that the salary paid to Del Monte might constitute private gain. It contends that there was no basis for this finding. Finally, plaintiff asserts that the Department erroneously determined that plaintiff did not establish that it did not provide a private gain to members in the form of exclusive membership benefits. In plaintiff's view, the vast majority of its resources and efforts benefit children and its members do not profit in a private sense from its activities when they are offered books at a discount or reduced-cost continuing medical education.

¶ 93    We conclude that the Department did not err in assessing this prong. The Department determined that there were "potential" private gains to employees and "a multitude" of private gains to members. Turning first to the gains to members, the evidence supported the Department's conclusion that membership benefits constituted private gains and that nonmembers were not so benefited. In addition to the discounts exclusively available to members for publications and educational conferences, the evidence supported a conclusion that only members received certain career benefits, *i.e.*, private gain, by virtue of that status. For example, the FAAP designation, according to Del Monte, could be an asset in a job search and was likely to be put on a member's biography. Further, the ability to be listed on the "Find a pediatrician" tool on plaintiff's website has career benefits and is available only to FAAP pediatricians. Committee membership is also highly sought after because it has professional benefits. See *Du Page Art League v. Department of Revenue*, 177 Ill. App. 3d 895, 901 (1988) (exclusive member benefit of ability to offer member artwork in galleries and reap 80% of sale proceeds constituted impermissible profit from the plaintiff nonprofit art gallery).

¶ 94    Turning to the potential gains to employees, the Department noted that, without corroborating documentary evidence such as the compensation surveys, it could not conclude that

there was clear and convincing evidence of no private gain to plaintiff's employees with the highest salary of $521,000 in 2017. The Department did note Miller's testimony that employee compensation, including the GAP bonus, is benchmarked by compensation surveys and is comparable to similar organizations.

¶ 95    We need not reach the issue of the employee compensation surveys because, as we determined above, we find no error with the Department's determination concerning the first prong of this factor and that portion of the second factor concerning the "multitude" of member benefits. This is a sufficient basis from which to uphold the Department's determination on this factor.

¶ 96    5. No Obstacles in Way of Those Who Need/Avail Themselves of Charity It Dispenses

¶ 97    The Department found that the fifth *Korzen* factor—that the organization does not appear to place any obstacles in the way of those who need and would avail themselves of the charitable benefits it dispenses—was not met, because plaintiff is a membership organization that imposes fees and eligibility requirements without waivers available to the public. Its dues waiver policy is reserved for only current and former members under severe health or financial exigencies that are documented by medical proof. Further, a waiver requires approval by two-thirds of the board. The Department noted that there is no set waiver policy available to the public for any of plaintiff's membership benefits, and, while there is a specific provision to waive the board certification requirement, the record was unclear whether the membership eligibility waiver extends to members of the public who are not pediatricians or medical students. Thus, the imposition of membership eligibility requirements and fees for membership and programs without waivers for the public established that plaintiff places obstacles in the way of those who need and would avail themselves of the benefits it dispenses.

¶ 98    Plaintiff argues that it satisfied this factor because it freely shares the benefits that it provides. It does not limit access to its findings, advice, and policy recommendations and makes the bulk of the information and advice that it develops, including its substantive policies, available free of charge to the general public through its websites. It also actively shares that information, it notes, with the public through radio and internet public service announcements, publications, YouTube videos, social media channels, and coordination with media outlets. Plaintiff further notes that it advertises the availability of its free resources and both responds to media inquiries and affirmatively reaches out to the media, including through its weekly mailer, to disseminate its policies, advocate for children, and address children's health crises as they happen. Plaintiff contends that the Department erroneously focused on membership requirements and incidental membership benefits rather than on the children and families who benefit, without charge, from its work. Finally, plaintiff contends that fee waivers to members are an inappropriate focus because doctors are not the ones "applying" for plaintiff's charity; rather, children are the beneficiaries of its work, and they benefit freely without needing to apply.

¶ 99    We conclude that the Department did not err in determining that this factor was not met. Plaintiff places barriers to the benefits it provides. Plaintiff is a membership organization, and membership is available only to members and students of the pediatric profession, not the general public, and only to those who pay the membership fee of, generally, about $650 per year. Membership may be terminated for failure to pay dues. Dues waivers are not offered with plaintiff's membership solicitation materials, and its dues waiver policy states that waiver requests must be submitted to its board of directors. Waivers are made on the basis of "several health or financial exigencies or other special circumstances" and require a two-thirds vote of the board. About 12% of memberships are discounted, with 20% of those consisting of fully discounted

memberships. Dues waivers are available to former members whose memberships lapsed but want to rejoin. Plaintiff has no waiver policy for its publications and programs, but it is open to speaking to those seeking a waiver, though it does not advertise this option. Members pay a lower fee for publications, the national conference, access to online medical databases, and continuing medical education courses.

¶ 100　The direct benefits plaintiff provides are to its members in the form of career advancement and education (with discounted fees for members), it charges a fee for membership, and it offers waivers under very limited circumstances. These barriers, plus the general lack of public access to plaintiff's property, support the Department's finding that plaintiff did not meet this factor. Plaintiff's provision of information to the public—such as via healthychildren.org, which Del Monte testified provides functions similar to those provided by for-profit websites—is incidental to its primary activity of serving its membership and does little to reduce or eliminate the obstacles to the benefits it provides. Compare *Joint Comm'n*, 274 Ill. App. 3d at 471 (factor not met where the plaintiff hospital accreditation organization charged a fee for the services it provided; rejecting the ALJ's determination that, because the plaintiff provided a benefit to the public as a whole rather than to particular individuals, this factor was not relevant), with *Arts Club of Chicago*, 334 Ill. App. 3d at 247-48 (factor met where the plaintiff arts club's minor barriers to the public's access to its art collection and art events did not impede nonmembers' ability to access collection; plaintiff employees were available to answer questions, no signs prohibited entry to various areas, and publications were available concerning the permanent collection).

¶ 101　　　　　　　　　　　　　　6. Balancing of Factors

¶ 102　Balancing the *Korzen* factors, the Department determined that plaintiff failed to prove by clear and convincing evidence that it was an exclusively charitable organization. It noted that only

one factor weighed in plaintiff's favor—having no capital, capital stock, or shareholders. Because the weight of the factors did not clearly establish that plaintiff is a charitable institution, we conclude that the Department did not err in balancing the *Korzen* factors. This, along with the Department's determination that the property was not exclusively used for charitable purposes, supported its determination that plaintiff was not entitled to an exemption.

¶ 103                                III. CONCLUSION

¶ 104   For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 105   Affirmed.

---

*American Academy of Pediatrics v. Department of Revenue*, **2023 IL App (2d) 210718**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 20-MR-920; the Hon. Craig R. Belford, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | David C. Blickenstaff, Neil Lloyd, and Michael K. Molzberger, of ArentFox Schiff LLP, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Bridget DiBattista, Assistant Attorney General, of counsel), for appellee Department of Revenue. |
| | Scott L. Ginsburg and Kelly M. Lyden, of Robbins Schwartz Nicholas Lifton & Taylor, Ltd., of Chicago, for other appellees. |